# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

STEPHANIE P.[1],

                             Plaintiff,

     v.                                        5:17-CV-599 (ATB)

COMMISSIONER OF SOCIAL SECURITY,

                             Defendant.

---

ELIZABETH KRUPAR, ESQ., Legal Aid Soc. of Mid NY, for Plaintiff
HASEEB FATMI, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## MEMORANDUM-DECISION and ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 6).

## I.    PROCEDURAL HISTORY

Plaintiff protectively filed[2] an application for Supplemental Security Income

---

[1] In accordance with recent guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Northern District of New York in June 2018 in order to better protect personal and medical information of non-governmental parties, this Memorandum-Decision and Order will identify the plaintiff using only her first name and last initial.

[2] When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. §§ 404.630, 416.340. There are various requirements for this written statement. *Id.* If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a later date.

("SSI") on December 19, 2013, alleging disability beginning December 7, 2012. (Administrative Transcript ("T") at 14). Her application was denied initially on March 28, 2014. (T. 102). Administrative Law Judge ("ALJ") Jennifer Gale Smith conducted a video-hearing on September 1, 2015, at which plaintiff and Vocational Expert ("VE") Linda N. Vause testified. (T. 40-66). In a decision dated November 9, 2015, the ALJ found that plaintiff was not disabled. (T. 11-32). The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on April 11, 2017. (T. 1-6).

## II.    GENERALLY APPLICABLE LAW

### A.    Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity
> that he is not only unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any other kind of
> substantial gainful work which exists in the national economy, regardless
> of whether such work exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections

404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

## B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than

the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III. FACTS

At the September 1, 2015 hearing, plaintiff testified that she was thirty-four years old and had graduated from high school, after participating in regular education classes. (T. 44). Plaintiff had prior work experience as a secretary and a cashier. (*Id.*) The secretarial work began in 2001, and her duties included answering the telephone, scheduling appointments, and sending informational documents by facsimile. (*Id.*) She

left the secretarial job when she had her first child. (*Id.*) Her next job was as a cashier for American Stores. (*Id.*) She left that job due to her Crohn's disease, for which plaintiff underwent surgery at that time.[3] (T. 45).

Plaintiff testified that, physically, she believed that she was unable to work due to her "irritable bowel" disease ("IBD").[4] (T. 45). She stated that she had severe cramping in her lower abdomen and on her left side and must use the restroom up to ten times, and at least seven times, per day. (*Id.*) Plaintiff stated that the pain lasts "a good hour-and-a-half despite the medication," and she was nauseated every morning. (*Id.*)

Plaintiff also testified that she suffered from fibromyalgia, with constant pain in her arms and legs. (*Id.*) Plaintiff stated that, due to the pain in her abdomen as well as in her arms and legs, she did not go shopping, nor did she leave her house very often. (T. 46). Plaintiff testified that she took Lyrica three times per day for her fibromyalgia, but that she also had trouble with her knees and wrists, for which she had an appointment to see a rheumatologist. (*Id.*)

Plaintiff stated that "mentally," she had a hard time leaving her house without her "puppy."[5] (T. 47). Plaintiff lived with her boyfriend,[6] who she met while she was

---

[3] Although it is not stated in the testimony, the record reflects that plaintiff had a partial small bowel resection in 2007. (T. 296 - surgical history).

[4] Plaintiff referred to her condition both as "Crohn's" and as "irritable bowel." (T. 45, 46). As discussed below, the plaintiff is referring to the same condition and its resulting limitations.

[5] Plaintiff brought her service dog to the hearing. (T. 42).

[6] At the time of the hearing in September of 2015, plaintiff had been living with her boyfriend for a year and four months. (T. 50). Previous to this, plaintiff lived with her parents. (*Id.*)

attending "Credo," a drug rehabilitation program.[7] (*Id.*)  Plaintiff testified that she continued to attend Credo twice per month until July of 2015 "only for mental health," and that her counselor there, "Ms. White," was helping her cope with her children, with her borderline personality, and with her authority issues. (T. 49).  Plaintiff testified that Ms. White was the best counselor that plaintiff ever had. (T. 49-50).  Plaintiff testified that she stopped taking illegal drugs in 2012, except for medical marijuana, which plaintiff stated that she only smoked in California because she had prescription there.[8] (T. 48).

Plaintiff testified that she had a good relationship with her boyfriend, and he was very good to her. (T. 47, 50).  Plaintiff stated that he did the shopping and the cooking. (T. 47, 51-52).  Plaintiff put the groceries away and did the laundry "as I go." (T. 47).  Plaintiff stated that her boyfriend was a student, and that he arranged his classes so that he could be home at noon to help plaintiff. (T. 51).  Plaintiff stated that she took care of her "puppy." (T. 51).  Although plaintiff spent most of the time in her room (T. 53), she could open her door for the dog to go out. (T. 51).  Plaintiff testified that, in her room, she watched television and listened to music. (T. 53).  Plaintiff testified that she would "Skype" with her children "at least every other day." (T. 52).  Sometimes, plaintiff went downstairs and sat with the dog. (T. 51).  Plaintiff's boyfriend took the dog fishing to "get her out of the house" when plaintiff was "relaxing." (*Id.*)

---

[7] Plaintiff later testified that she went to Credo in 2010, but that she had to go twice because she did not finish the program prior to going to jail. (T. 48).  Plaintiff was incarcerated for five months, beginning in August of 2012 and completed probation in January of 2013. (T. 21, 52).

[8] Plaintiff told the ALJ that she did not smoke in New York State. (T. 48).

Plaintiff testified that, even though she had a "problem with authority," and she was not "meek," she was never fired from any jobs, and she "[got] along fine with coworkers." (T. 53-54). Plaintiff stated that she had some good days and some bad days, but her IBD was "constant" and unpredictable every day. (T. 54). Plaintiff stated that if she went out, she always brought extra clothes with her because of accidents associated with the IBD. (T. 54). Plaintiff stated that her treating physician, Dr. Sara Mitchell prescribed Percocet for the pain, and plaintiff started taking Humera for the IBD. (T. 55). In addition to the Percoset, plaintiff took Risperidone, Lamictal, and Xanax, which caused her substantial fatigue. (T. 55). Plaintiff testified that the Percocet was not "taking care of much pain," and that the doctor wanted to increase the dosage, but the insurance would not cover it, although she "just took the script and went with it." (T. 55-56). Plaintiff stated that she was just trying to "put the pain out of [her] head . . . ." (T. 56).

Plaintiff testified that she lost 40 pounds in the past year for no reason. (*Id.*) She stated that she gained about seven pounds back after she began taking the Risperdone. (*Id.*) Plaintiff stated that her "mental health mood" seemed a little better, but that she was still going to the bathroom "quite a bit." Plaintiff had just started taking the Humira, so it was "too . . . soon to tell." (*Id.*)

Plaintiff testified that she felt stressed or anxious "all the time," even when she was by herself. (T. 58). Plaintiff also stated that her concentration was "bad," but that she tried hard, and she was "a lot better than [she] used to be. (*Id.*) Plaintiff found it difficult to "stay on track," and stated that she was forgetful, but that her boyfriend was

helpful, and that both of them wrote notes to remind her of things. (T. 59). Plaintiff testified that she saw Dr. Lawrence Littell, who prescribed her "mental health medication." Plaintiff then listed the medications that she took for her mental impairments, together with the specific dosages. (*Id.*) Plaintiff testified that, in addition to the fatigue, the medications affected her memory and concentration, "despite the Adderall." (T. 60).

The ALJ then took the testimony of VE Linda Vause. (T. 61-66). VE Vause first summarized plaintiff's previous work, and the ALJ then asked a hypothetical question. (T. 61-62). The ALJ asked the VE to assume that the plaintiff was capable of light work, but she should avoid concentrated exposure to dust, odors, fumes, gases, and temperature extremes. (T. 61). Plaintiff should only be required to work at simple, repetitive tasks in a low-stress environment. (T. 61-62). Low stress was defined as requiring only occasional decision-making, judgment, and changes in the work setting. (T. 62). Plaintiff could have occasional contact with co-workers, supervisors, and the public. She should not climb ladders, ropes, or scaffolds, nor should she kneel, crouch, squat, or crawl. She could occasionally stoop, climb ramps and stairs, and balance. (*Id.*) She could frequently reach. Plaintiff should also be allowed to use the bathroom at will up to five times per day. (*Id.*)

Based on the ALJ's hypothetical, the VE testified that plaintiff could not perform her prior work, but that she could perform the jobs of office helper, photocopying machine operator, and routing clerk.[9] (T. 62-63). The VE testified, based on her own

---

[9] It is unclear whether these were the only three jobs available because the ALJ asked the VE only to give "three representative examples." (T. 62).

experience,[10] that employers would tolerate absences "up to one day per month" and that they would tolerate a worker being "off-task" up to 15% of the workday. (T. 63).

The plaintiff's representative asked the VE a second hypothetical question, which contained all the restrictions listed by the ALJ, but adding limitations on plaintiff's ability to stand, walk, sit, and reach. (T. 63-64). Plaintiff's representative also asked the VE assume that plaintiff could only have "no more than simple, short interactions with supervisors, co-workers, and the public and could "seldom maintain attention and concentration necessary to follow instructions or complete job tasks." (T. 64). Plaintiff would also require frequent, unscheduled breaks during the workday, "during which she would be off task" at least 20% of the day. Finally, plaintiff's condition would result in "high absenteeism up to four days per month." (T. 64). The VE testified that there were no jobs that such an individual could perform. (*Id.*)

Finally, the ALJ stated that she was going to send plaintiff's file to a gastroenterologist to determine whether plaintiff's IBD met the severity of a Listed Impairment. (T. 64-65). The ALJ decided to obtain an expert opinion after the hearing because some of the medical records were contradictory, and the ALJ also wanted an opinion regarding plaintiff's substantial weight loss. (T. 65).

Defense counsel has incorporated the facts contained in the ALJ's decision as well as the plaintiff's brief, with "the exception of any conclusions, arguments, or inferences therein. (Def.'s Br. at 2). The ALJ's decision provides a detailed statement

---

[10] The VE stated that her opinion was consistent with the Dictionary of Occupational Titles ("DOT"), with the exception of her testimony regarding absences and the employee's being "off task." (T. 63). Her opinion regarding absences and concentration was based on "professional experience." (*Id.*)

of the medical and other evidence of record. (T. 12-16). Rather than reciting this evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff.

## IV.   THE ALJ'S DECISION

The ALJ stated that plaintiff has not engaged in substantial gainful activity since December 19, 2013, her current application date.[11]  At step two of the sequential evaluation, ALJ Gale-Smith found that plaintiff had the following severe impairments: fibromyalgia, asthma, Crohn's disease,[12] bipolar disorder, an anxiety disorder, a personality disorder, and a history of cocaine dependence - in remission. (T. 16).  The ALJ noted that "[d]uring any given encounter," health professionals gave plaintiff various diagnoses for her mental impairment, but that in determining whether an individual is disabled, the ALJ must focus on how the impairment affects plaintiff's mental functioning. (T. 17).  The ALJ stated that, by finding that plaintiff had severe mental impairments, "however characterized, the ALJ considered all the symptoms affecting plaintiff's mental functioning. (*Id.*)

The ALJ also found that several of plaintiff's impairments, for which she was "medically managed" were not "severe." (*Id.*)  The non-severe impairments included:

---

[11] Before beginning her decision, the ALJ noted that plaintiff had filed three prior SSI applications. (T. 14).  The most recent on January 28, 2011. (*Id.*)  The application was denied initially on May 6, 2011.  Plaintiff requested a hearing after the initial denial, and, after a hearing, an ALJ issued an unfavorable decision on December 6, 2012. (*Id.*)  In her current application, plaintiff alleges an onset date of December 7, 2012, the day after the prior ALJ's decision. (*Id.*)  ALJ Gale-Smith found no grounds to reopen the prior application, thus, she determined that the prior unfavorable determinations were "final and binding." (T. 14).

[12] Crohn's disease is an IBD. http://www.mayoclinic.org/diseases-conditions/crohns-disease/symptoms-causes/syc-20353304.

obesity, chronic pain syndrome, back pain, knee pain, history of arthritis, chronic diarrhea, nausea, heartburn, abdominal pain, irritable bowel syndrome,[13] status post 2007 bowel resection, hemorrhoids, sleep disturbance, insomnia, hepatitis C, chronic obstructive pulmonary disease ("COPD"), history of marijuana use, tobacco use disorder, smoking cessation, sinusitis, and a vitamin D deficiency. (*Id.*) Notwithstanding that the ALJ found many of plaintiff's impairments to be non-severe, the ALJ stated that she considered the limiting effects of all plaintiff's impairments in determining plaintiff's RFC. (*Id.*)

At step three of the sequential evaluation, the ALJ found that the severity of plaintiff's impairments did not rise to the level of any of the relevant Listed Impairments. (*Id.*)  The ALJ first stated that plaintiff did not have any specific clinical signs or diagnostic findings accompanying her diagnosis of fibromyalgia to meet or equal any of the requirements of a Listing. (*Id.*)  The ALJ considered Listings 3.02 and 3.03 with respect to plaintiff's respiratory impairments.  The ALJ considered the Listings at section "5.00 et seq." to evaluate the severity of plaintiff's Crohn's disease, but found that plaintiff did not meet all the requirements.  In addition, the ALJ noted that medical expert, Michael D. Falkove, M.D. found that plaintiff's gastrointenstinal impairment did not rise to the severity of a listing.[14] (T. 18).

---

[13] The court notes that the ALJ included "irritable bowel *syndrome* ("IBS")" as a "non-severe impairment," while finding that the Crohn's disease was a "severe" impairment.  IBS is a less severe diagnosis, is not a chronic illness, and does not involve inflammation of the digestive tract. https://www.webmd.com/ibs/ibd-versus-ibs.

[14] Dr. Falkove was the medical expert that the ALJ consulted after the administrative hearing. (T. 535-44).

With respect to plaintiff's mental impairments, the ALJ considered Listings 12.04; 12.06; 12.08; and 12.09. (T. 18). The ALJ found insufficient limitations to satisfy the paragraph "B" criteria of the Listings. (*Id.*) Plaintiff had only mild restrictions in activities of daily living; moderate restrictions in social functioning; moderate difficulties in concentration, persistence, and pace; and only one or two episodes of decompensation that lasted for an extended duration. (T. 18-19). Because plaintiff did not have at least two "marked" limitations or one marked limitation plus "repeated episodes" of decompensation of extended duration, the Listings were not satisfied. (T. 19). The ALJ also found that paragraph "C" of Listing 12.04 was not satisfied. Finally, the ALJ recognized that the Listing evaluation was not a complete RFC evaluation and noted that the RFC evaluation required a more detailed analysis. (*Id.*)

At step four of the analysis, the ALJ found that plaintiff had the RFC for light work, but that she was unable to kneel, crouch, squat, crawl, climb ladders, ropes and scaffolds, but she was able to occasionally balance, stoop, and climb ramps and stairs. (T. 19-20). Plaintiff was also able to reach frequently, but must avoid concentrated exposure to temperature extremes and respiratory irritants, such as fumes, odors, dust, and gases. Plaintiff must be able to use the bathroom at will, up to five times per 8-hour workday. (T. 20). The ALJ found that the plaintiff was able to engage in simple, repetitive, routine tasks at a low-stress job, which is defined as a job with occasional changes to the work setting, that require occasional judgment and occasional decision-making. Finally the ALJ found that plaintiff was able to engage in occasional contact

with co-workers, supervisors, and the public. (*Id.*)

In explaining her findings, the ALJ stated that she considered plaintiff's symptoms in accordance with the statute and Social Security Rulings. (T. 20). The ALJ noted that whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ "must make a finding on the credibility of the statements based upon a consideration of the entire record." (*Id.*) The ALJ reviewed and summarized plaintiff's testimony at the hearing and found that although plaintiff's medically determinable impairments could be expected to cause the alleged symptoms, the plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not "fully credible." (T. 21).

The ALJ cited plaintiff's "conservative" treatment modalities for her fibromyalgia and her Crohn's disease, including plaintiff's refusal to purchase fiber to help with the Crohn's disease because she did not want to spend the money on it. (*Id.*) The ALJ cited a primary care treatment note, stating that Lyrica worked well for plaintiff's fibromyalgia pain management. (*Id.*) Plaintiff's treating Physician's Assistant (PA), Maria Lake "strongly encouraged" plaintiff to "get a job" because "she needs a commitment, a routine," and PA Lake encouraged plaintiff to exercise. (*Id.*) The ALJ also noted that a June 2015 primary care treatment note stated that plaintiff had "about five loose stools per day." (T. 22). She took Advair and a Ventolin inhaler "as-needed" to manage her asthma, and she continued to smoke "against medical advice." (*Id.*)

The ALJ then reviewed plaintiff's mental status, stating that plaintiff had a history of outpatient counseling and medication management, cited a note which stated that plaintiff had lied about experiencing auditory hallucinations, and noted that there was a two-year gap in mental health treatment, five months of which were spent incarcerated. Plaintiff attended a substance abuse rehabilitation program, which she successfully completed in 2014. (*Id.*) Plaintiff was discharged with an improved Global Assessment of Functioning ("GAF") score.[15]

The ALJ reviewed a number of treating, non-treating, and non-examining mental health providers' reports. (T. 22-23). The ALJ gave significant weight to the opinions expressed by Dr. Hoffman (a non-examining expert), due to her programmatic expertise, and very significant weight to Dr. Lorensen (a consultative physician), due to his programmatic expertise and his examination of the plaintiff. (T. 24). The ALJ also gave plaintiff's treating Social Worker ("SW") White "very significant weight because of her treating relationship with the plaintiff and because her opinions were supported by the record evidence. (*Id.*) The ALJ noted that, in making her RFC determination, she considered "the balance" of the evidence from several providers, some of which was conflicting. (*Id.*) The ALJ gave "reduced weight to the opinion of Dr. Sara Mitchell, M.D., plaintiff's treating gastroenterologist, because some of her findings

---

[15] The GAF is a 100 point scale. A score of 41-50 indicates "serious symptoms," 51-60 indicates "moderate symptoms," 61-70 indicates "some mild symptoms," and 71-80 indicates that if symptoms are present, they are "transient" and "expectable reactions to psycho-social stressors," resulting in "no more than a slight impairment in social, occupational, or school functioning." AMERICAN PSYCHIATRIC ASSN., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32-34 (4th Ed. Text Revision 2000) ("DSM-IV-TR"). The GAF is no longer included in the most recent edition of the DSM. http://jaapl.org/content/42/2/173. The parties do not base any arguments on plaintiff's GAF.

were inconsistent with each other and with the overall medical evidence, particularly with the opinions of Dr. Hoffman, Dr. Noia, Dr. Lorensen, and SW White. (*Id.*) The ALJ also gave reduced weight to the physical RFC assessment of reviewing expert Dr. Falkove, due to "the objections of claimant's representative." (*Id.*) The ALJ gave "minimal weight to the opinions of Dr. Littell, who opined that plaintiff needed a therapy dog with her at all times. (T. 25). The ALJ also considered plaintiff's obesity in his determination. (*Id.*)

At step four of the sequential analysis, the ALJ found that, based on the RFC, plaintiff could not perform her previous work. (*Id.*) However, at step five of the sequential analysis, based on the RFC discussed above, the hypothetical question, and the testimony of the VE, the ALJ found that plaintiff could perform other work in the national economy. (T. 26-27).

## V.    ISSUES IN CONTENTION

Plaintiff raises the following arguments:

1.    The ALJ improperly weighed the medical evidence. (Pl.'s Br. at 10-16) (Dkt. No. 9).

2.    The ALJ failed to develop a full and fair record. (Pl.'s Br. at 16-18).

3.    The ALJ erred in failing to find that plaintiff met Listing 5.06. (Pl.'s Br. at 18-22).

Defendant argues that the Commissioner's determination was supported by substantial evidence and should be affirmed. (Def.'s Br. at 4-19) (Dkt. No. 11). For the following reasons, this court agrees with the defendant and will dismiss the complaint.

## VII.  LISTED IMPAIRMENT

### A.    Legal Standards

At step three of the disability analysis, the ALJ must determine if plaintiff suffers from a listed impairment.  *See* 20 C.F.R. §§ 404.1520, 416.920.  It is the plaintiff's burden to establish that his or her medical condition or conditions meet *all* of the specific medical criteria of particular listed impairments.  *Pratt v. Astrue,* 7:06-CV-551, 2008 WL 2594430 at *6 (N.D.N.Y. 2008) (citing *Sullivan v. Zebley,* 493 U.S. 521, 530 (1990)).  If a plaintiff's "impairment 'manifests only some of those criteria, no matter how severely,' such impairment does not qualify." *Id.*  In order to demonstrate medical equivalence, a plaintiff "must present medical findings equal in severity to all the criteria for the *one* most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. at 531 (emphasis added).

### B.    Application

Although this is plaintiff's last argument, the court will consider it first.  In this case, plaintiff argues that the ALJ erred in failing to find that the severity of plaintiff's Crohn's disease met the severity of Listing 5.06. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 5.06.  Listing 5.06 is entitled "Inflammatory Bowel Disease," and contains Parts A and B.  A claimant must meet either Part A or Part B in order to meet the severity of the Listing.  Plaintiff in this case argues that she meets Part B.

In order to meet Part B of Listing 5.06, plaintiff must have IBD, documented by one of various methods.  The ALJ found that plaintiff has Crohn's disease.  Thus, the court need not discuss the first part of the listing.  However, in addition to a

documented impairment, plaintiff must have "two" of six additional findings. Listing 5.06(B)(1)-(B)(6). Plaintiff argues that she meets (B)(3) and (B)(5).[16] Sections (B)(3) and (B)(5) provide as follows:

> 3.    Clinically documented tender abdominal mass palpable on physical examination with abdominal pain or cramping that is not completely controlled by prescribed narcotic medication, present on at least two evaluations at least 60 days apart; or
> . . .
>
> 5.    Involuntary weight loss of at least 10 percent from baseline, as computed in pounds, kilograms, or BMI, present on at least two evaluations at least 60 days apart . . . .

Plaintiff argues that Dr. Mitchell found that plaintiff had a "clinically documented abdominal mass," with pain or cramping that was not controlled by prescribed narcotic medication, and that plaintiff had the requisite weight loss. (Pl.'s Br. at 20). Plaintiff cites a "check-the-box" form completed by Dr. Mitchell on August 13, 2015.[17] (T. 411). The check-the-box form lists the requirements of Listing 5.06 and asks the doctor to check the box next to the symptoms that plaintiff displays, with a notation at the top which reads: "(B) at least two of the following," and then lists (B)(1) through (B)(6). (T. 411). Dr. Mitchell checked the boxes for (B)(3) and (B)(5). (*Id.*)

Plaintiff then argues that Dr. Mitchell found plaintiff's abdomen to be tender on

---

[16] She does not claim to meet any of the other subsections of Part B.

[17] This form is entitled "Digestive System Impairment Questionnaire" ("DSQ"). (T. 408). The DSQ includes questions regarding the presence or absence of symptoms that are included in the Listings as well as the standard "Functional Limitations" found in a Medical Source Statement or RFC evaluation, such as the ability to sit, stand, walk, carry, bend, squat, climb, reach, and lift. (*See* T. 412-14). The DSQ also contains questions regarding attendance, and the need for "unscheduled breaks." (T. 413).

physical examination on "numerous visits." (Pl.'s Br. at 20) (citing T. 426, 429-30, 463, 467, 472, 476, 485).  However, the Listing requires a tender "abdominal ***mass***," not simply a tender abdomen with pain and cramping. Listing 5.06(B)(3) (emphasis added). A review of each of the examinations cited by plaintiff shows that Dr. Mitchell stated specifically that while there was "tenderness," there were "**no masses**." (T. 426, 430, 463, 467, 472, 476, 485) (emphasis in original).  In fact, during these examinations, plaintiff abdomen showed "normal consistency" and "normal bowel sounds." (*Id.*)  This is completely inconsistent with Dr. Mitchell's check-the-box form. These citations include all the examinations from Dr. Mitchell's initial examination on March 26, 2014 to the most recent examination on July 18, 2015, less than one month prior to completing the check-the-box form.

In *Halloran v. Barnhart*, 362 F.3d 28, 31 n.2 (2nd Cir. 2004), the Second Circuit noted the "limited value of the standardized check-box forms, which are considered only marginally useful for purposes of creating a reviewable factual record." *See Sabater v. Colvin*, No. 12-CV-4594, at *5 n.6 (S.D.N.Y. Mar. 10, 2016) (citing cases, including *Halloran*, supra).  There are also cases, holding that check-the-box questionnaires are a proper format for a treating physician to express an opinion. *Goble v. Colvin*, No. 15-CV-6302, 2016 WL 3179901, at *5 (W.D.N.Y. June 8, 2016) (citations omitted).  This court does not question that check-the-box forms are widely used and are not invalid simply because of the nature of the form; however, in this case, the questionnaire was inconsistent with Dr. Mitchell's multiple contemporaneous examinations of the plaintiff.  As stated above, plaintiff must meet every criterion of the

Listing. Therefore, even if plaintiff had the requisite weight loss[18] to meet subsection (B)(5), she would still fail to meet the severity of the Listing because she clearly does not meet the requirements of (B)(3), and she must have two of the six criteria.

Plaintiff also criticizes the ALJ for relying on the opinion of a reviewing medical expert, Dr. Michael D. Falkove, M.D., who opined that plaintiff did not meet the requirements of a Listed impairment. (Pl.'s Br. at 21-22). Plaintiff states that the ALJ relied on Dr. Falkove for a determination that plaintiff did not meet a Listing, while later giving Dr. Falkove "reduced weight" due to the objections of the plaintiff's representative. (T. 18, 24). The ALJ based her rejection of some of Dr. Falkove's report because his interrogatory contained question marks covering sections which asked about plaintiff's ability to lift and carry, together with illegible scribbles covering sections which asked about plaintiff's ability to stand, walk and sit. (T. 24). However, the ALJ noted that notwithstanding the check-the-box questionnaire, Dr. Falkove

---

[18] This court makes no such finding. As defendant points out, plaintiff is obese, with a BMI which has been consistently close to, or more than 30. She has been "encouraged" by many of her providers to lose weight. (T. 301, 304, 311, 314, 368). On March 10, 2015, plaintiff's treating provider PA Lake "counseled" plaintiff on "appropriate weight loss." (T. 368). PA Lake did note that "some" of her weight loss was due to poor absorption from her Crohn's disease and her depression. (*Id.*) There is a separate Listing which is based on involuntary weight loss alone. Listing 5.08. Plaintiff does not, and cannot, argue that she meets the severity of this Listing, even though Dr. Mitchell's check-the-box form states that plaintiff meets Listing 5.08 as well. Dr. Mitchell has clearly misread the Body Mass Index ("BMI") requirement which accompanies the weight loss in Listing 5.08. (T. 412). In order for an individual to meet Listing 5.08, she must have suffered weight loss due to any digestive disorder despite continuing treatment, ***with a BMI of less than 17.50 calculated on at least two evaluations at least 60 days apart within an consecutive six month period.*** " Listing 5.08 (emphasis added). Dr. Mitchell provided the following information: plaintiff's weight decreased from 192 to 187, but her BMI was 29.19 and 29.29, nowhere near the required BMI of 17.50 for Listing 5.08. The plaintiff concedes that Dr. Mitchell erred in checking the box indicating that plaintiff meets Listing 5.08, because it is clearly inconsistent with plaintiff's BMI. However, plaintiff argues that the weight loss listed is consistent with (B)(5) of Listing 5.06, and that the ALJ should have re-contacted Dr. Mitchell to clarify this error and any other inconsistency in his check-the-box report. (Pl.'s Br. at 16-18). The court will discuss the issue of re-contacting plaintiff's treating physician below.

drafted a "detailed narrative" regarding his opinion that plaintiff did not meet a Listing. (T. 25).

There is no requirement that the ALJ adopt each finding by a medical provider. The ALJ may reject portions of a physician's report while adopting others. as long as the ALJ's conclusions are supported by substantial evidence in the record. *Matta v. Astrue*, 508 F. App'x 53, 56-57 (2d Cir. 2013) (although the ALJ's conclusion may not perfectly correspond with any of the medical source opinions cited in the decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole); *Veino v. Barnhart*, 312 F.3d 578, 588-89 (2d Cir. 2002) (ALJ did not err in crediting only a small part of treating physician's report).

In this case, the ALJ was correct in not giving weight to the physical capacities questionnaire completed by Dr. Falkove which contained many question marks instead of answers.[19] (T. 539-44). However, although the "narrative" portion of the report was not terribly detailed, the doctor did state that the plaintiff has "Crohn's (11F) with abdm mass and weight ↓ ***per report*** - not substantiated in records" (T. 536). "11F" is Dr. Mitchell's DSQ, and Dr. Falkove is stating that the opinion in this report, (11F) is not substantiated in the records. Given the medical reports cited above, including Dr. Mitchell's own reports, this finding by Dr. Falkove is supported by substantial evidence.

---

[19] Essentially, Dr. Falkove did not opine on plaintiff's physical capabilities.

## VIII.  RFC and WEIGHT OF THE EVIDENCE

### A.    Legal Standards

#### 1.    RFC

RFC is "what [the] individual can still do despite his or her limitations.
Ordinarily, RFC is the individual's maximum remaining ability to do sustained work
activities in an ordinary work setting on a regular and continuing basis. . . ."  A "regular
and continuing basis" means eight hours a day, for five days a week, or an equivalent
work schedule.  *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2
(N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999)
(quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical
facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's
subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R.
§§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999)
(citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  An ALJ must
specify the functions plaintiff is capable of performing, and may not simply make
conclusory statements regarding a plaintiff's capacities.  *Martone v. Apfel*, 70 F. Supp.
2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v.
Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460
(W.D.N.Y. 1987)).  The RFC assessment must also include a narrative discussion,
describing how the evidence supports the ALJ's conclusions, citing specific medical
facts, and non-medical evidence.  *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL

3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

## 2.     Treating Physician

"Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record . . . ." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  The ALJ must properly analyze the reasons that a report of a treating physician is rejected.  *Halloran,* 362 F.3d at 32-33.  An ALJ may not arbitrarily substitute his own judgment for competent medical opinion.  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

## 3. Weight of the Evidence

The ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996).  Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings."  The responsibility for determining these issues belongs to the Commissioner. SSR 96-5p, 1996 WL 374183, at *2.  These issues include whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.* In evaluating medical opinions on issues that are reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R.  §§ 404.1527(d) and 416.927(d).  The

ALJ must clearly state the legal rules that he applies and the weight that he accords the evidence considered. *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

## B.    Application

Plaintiff argues that the ALJ should have given controlling weight to the DSQ completed by Dr. Mitchell on August 13, 2015. (T. 408-414).  The DSQ provides that plaintiff could only sit continuously for four hours, for a total of four hours in an eight-hour day; and could stand and walk continuously for one hour each, for a total of one hour each during an eight-hour day. (T. 413).  Dr. Mitchell found that plaintiff could lift 21-25 pounds "occasionally," 11-20 pounds "frequently," and up to 10 pounds "continuously." (*Id.*)  Dr. Mitchell also found that plaintiff could use her hands and feet on a repetitive basis. (*Id.*)  She could bend, squat, climb, and reach "occasionally." (T. 414).

Dr. Mitchell answered "yes" to the question of whether plaintiff's "condition and/or symptoms interfere" with the ability to attend work on a regular basis, due to either an inability to commute daily by public transportation or due to frequent absences or due to frequent bathroom breaks? Etc." (T. 413).  However, Dr. Mitchell left the explanation portion of this question blank. (*Id.*)  The next question asked about "unscheduled breaks (e.g. restroom; lie down, etc.) during an 8-hour working day." (*Id.*)  Dr. Mitchell explained that these breaks would be "unpredictable, varying based on symptoms." (*Id.*)  Dr. Mitchell did not specify how many breaks the plaintiff would

need.  Dr. Mitchell wrote "N/A" under "environmental limitations, and left "Other limitations" blank. (T. 414).  Dr. Mitchell ended her report by stating that plaintiff had a "chronic condition w/intermittent relapses + remissions.  She will [sic] long term medications + follow up[.]" (T. 414).

Dr. Mitchell's DSQ indicates that plaintiff could perform the lifting requirements of light work.  In fact, the DSQ indicates that plaintiff could lift and carry more than light work requires.  The ALJ also accepted Dr. Mitchell's diagnosis of Crohn's disease.  However, the ALJ gave "reduced weight" to Dr. Mitchell's DSQ, insofar as it opined on plaintiff's ability to "sit, stand, and walk," because she provided no explanation for these significant limitations, and they were contradicted by the opinions of Dr. Lorensen. (T. 24).  In the same sentence, the ALJ also stated that the opinions expressed in Dr. Mitchell's DSQ were "inconsistent with each other and the overall medical evidence, including the opinions of Dr. Hoffman, Dr. Noia, Dr. Lorensen, and Social Worker White." (T. 24).

Plaintiff argues that "none of these other doctors are gastroenterologists, dealing with Crohn's disease," and that none of them had any opinion about the limitations resulting from the Crohn's disease. (Pl.'s Br. at 13).  The ALJ accepted Dr. Mitchell's opinion regarding plaintiff's diagnosis of Crohn's disease.  However, the ALJ gave less weight to Dr. Mitchell's assessment of plaintiff's physical limitations because it was unclear how Dr. Mitchell determined that  plaintiff's abilities to sit, stand, and walk were limited to four hours for sitting and one hour for standing and walking based on plaintiff's Crohn's disease.  As plaintiff states, Dr. Mitchell's specialty is

gastroenterology, not musculoskeletal impairments. Thus, her failure to explain why she found more significant physical limitations that were not related to plaintiff's Crohn's disease was a valid reason for the ALJ to give the opinion reduced weight. This is particularly true when none of Dr. Mitchell's contemporaneous treatment notes addressed any such limitations.

In addition, when the ALJ listed the other medical providers as evidence contradicting Dr. Mitchell's opinion, the ALJ did not mean that all of the providers opined on plaintiff's physical abilities or that the providers discussed plaintiff's Crohn's disease. Rather, the ALJ appears to have intended that Dr. Mitchell's general opinions regarding plaintiff's physical abilities as well as her alleged difficulty in maintaining regular attendance was inconsistent with the opinions of the various medical providers, not that all the medical providers listed opined about the same impairments or limitations.

For example, after a consultative examination, Dr. Lorensen found that plaintiff had moderate limitations in the ability to lift, bend, and reach, but *no* limitations in the ability to stand, walk, sit, and handle small objects with her hands. (T. 22, 343). Dr. Lorensen was opining on all of plaintiff's alleged impairments, including her history of fibromyalgia. (T. 340-43). Dr. Lorensen completed a full musculoskeletal evaluation, including range of motion measurements and strength evaluations. (T. 342-43). While there were some limitations noted in the movement of the lumbar spine, hips, shoulders, and knees, plaintiff had full range of motion in her cervical spine, her elbows, forearms, and wrists. (T. 342). Straight leg raising was negative bilaterally, and only "two plus

trigger points"[20] were identified. (*Id.*)

Plaintiff had full strength in her upper and lower extremities with no atrophy. (T. 343). There were no sensory deficits noted. (*Id.*) Her gait was normal, even though she "declined" to walk on her heels and toes. (T. 341). Her stance was normal, and her squat was 40%, but she did not use any assistive devices and needed no help changing for the exam, getting on and off the examination table. She was able to rise from her chair without difficulty. (*Id.*) Dr. Lorensen did comment that plaintiff displayed "poor effort during the entire exam." (T. 341).

Dr. Mitchell's contemporaneous notes contained physical examinations of the plaintiff, but these examinations did not focus on plaintiff's functional abilities. In fact, other than noting that plaintiff occasionally complained of back pain and muscle weakness, the physical examinations resulted in normal findings. (T. 462-63, 471-72, 475-76, 480). Dr. Mitchell did not explain how the limitations for sitting, standing, and walking, contained in the DSQ were associated with functional limitations from her Crohn's disease. The ALJ was not giving Dr. Mitchell less weight regarding the diagnosis relating to her specialty, rather, the ALJ was giving Dr. Mitchell's specific physical RFC assessment less weight because it was inconsistent with Dr. Lorensen's findings and was not supported by Dr. Mitchell's own contemporaneous notes.

The examination of a consultative physician may be substantial evidence contradicting the treating physician if the findings are consistent with the record as a

---

[20] According to the American College of Rheumatology ("ACR") guidelines, a diagnosis of fibromyalgia is supported by clinical signs and symptoms, including widespread pain in all four quadrants of the body and at least 11 of the 18 specified tender or "trigger points." *See* SSR 12-2p.

whole. *See, e.g., Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (upholding ALJ's determination that a treating doctor's opinions were unpersuasive chiefly because his findings were contrary to those in the consultative examination and because the treating doctor failed to provide any objective medical evidence to support his findings); *House v. Comm'r of Soc. Sec.*, 32 F. Supp. 3d 138, 151-52 (N.D.N.Y. 2012) ("It is well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability") (citing, inter alia, *Leach ex rel. Murray v. Barnhart*, No. 02 Civ. 3561, 2004 WL 99935, at *9 (S.D.N.Y. Jan. 22, 2004) ("State agency physicians are qualified as experts in the evaluation of medical issues in disability claims. As such, their opinions may constitute substantial evidence if they are consistent with the record as a whole.")) 

The court also notes that the ALJ was commenting on Dr. Mitchell's opinion regarding plaintiff's alleged difficulty maintaining regular attendance and requiring "occasional unscheduled breaks." (T. 24). The ALJ associated the limitation on attendance, in part, with plaintiff's mental impairments, and that explains the reference to the opinions of Dr. Hoffman, Dr. Noia, and SW White. (T. 24). As argued by the defendant, the ALJ was examining the record "as a whole." (Def.'s Br. at 15).

Dr. Noia found that plaintiff had no limitations in performing simple tasks, only mild limitations in performing complex tasks and maintaining attention and concentration. (T. 338). Plaintiff had mild to moderate limitations in her ability to attend to a routine and maintain a schedule. (*Id.*) Although Dr. Noia indicated plaintiff

"appear[ed]" to have "marked limitations" in her ability to deal with stress, the ALJ did not accept that finding because SW White and non-examining state agency reviewing physician Dr. Hoffman did not identify a marked limitation in any category, including the ability to deal with stress. (T. 24) (discussing T. 415, 96-98).

The court notes that although SW White is not an "acceptable medical source" under the regulations applicable to plaintiff's application for purposes of diagnosing or establishing an impairment, her opinion may be considered by the ALJ in reaching her RFC assessment. 20 C.F.R. § 416.927(f)(1) & (f)(2).[21] SW White saw plaintiff from June 17, 2014 through the time that she wrote her report on August 14, 2015. (T. 415). Thus, plaintiff and SW White had time to establish a lengthy treatment relationship. SW White's August 14, 2015 report stated that plaintiff was cooperative and attentive and had made progress regulating her emotions and reactions to her environment. (T. 415). Plaintiff's speech was spontaneous and productive, with a normal rate. She had no thought process disorder, and her responses were clear and coherent, her mood was euthemic, and her affect was congruent with a full range of emotions. (*Id.*)

In addition, the ALJ adopted Dr. Mitchell's determination that plaintiff would need several unscheduled bathroom breaks during the day due to the Crohn's disease,

---

[21] These sections provide the regulations applicable to the evaluation of evidence for claims filed prior to March 27, 2017. The sections of the Social Security regulations defining and evaluating medical and non medical evidence have been re-written, but the Agency has included regulations applicable to claims filed before and after the change. Without engaging in a lengthy discussion of all the changes, the court simply notes that the regulations do provide that a Social Worker's opinion may be considered in determining a claimant's RFC, depending on the report's consistency with other evidence of record and considering the length of the treatment relationship, the supporting evidence, and explanation for the individual's opinion. 20 C.F.R. § 416.927(f)(1).

and she included this limitation in the RFC determination.[22]  The VE specifically considered this limitation in determining that plaintiff could perform other work in the national economy.  Thus, the ALJ did not err in her analysis of the record, and her RFC evaluation is supported by substantial evidence.

Plaintiff argues that if the ALJ decided not to give controlling weight to Dr. Mitchell's RFC assessment, the ALJ should have re-contacted Dr. Mitchell for an explanation of the listed restrictions. (Pl.'s Br. at 16-18).  Plaintiff is incorrect when she argues that the ALJ failed to properly develop the record and was required to re-contact the treating physician.  It is well-settled that, because a hearing on disability benefits is a nonadversarial proceeding, the ALJ has an affirmative duty to develop the record, whether or not a plaintiff is represented. *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999).  Prior to March of 2012, the regulations provided that when the treating physician's report contained "a conflict or ambiguity" that must be resolved, the ALJ was required to "seek additional evidence or clarification" from that source in order to fill in any clear gaps before rejecting the doctor's opinion. *Rolon v. Commissioner of Soc. Sec.*, 994 F. Supp. 2d 496, 504-505 (S.D.N.Y. 2014) (citing inter alia *Correale Englehart v. Astrue*, 687 F. Supp. 2d 396, 428 (S.D.N.Y. 2010); 20 C.F.R. §§ 404.1512, 416.912 (2010)).  This duty arose if the physician's report was "insufficiently explained, lacking in support, or inconsistent with the physician's other reports." *Id.*

---

[22] The ALJ found that plaintiff must be allowed to use the bathroom "at will" up to five times per eight-hour work day. (T. 20).  Presumably, this would apply to times when plaintiff would otherwise be working, and would not include use of the bathroom during scheduled breaks, such as lunch-time.  This means that plaintiff would be allowed to use the bathroom approximately every ninety minutes.

Effective March 26, 2012, the Commissioner amended 20 C.F.R. §§ 404.1512 (e)(1) and 416.912(e)(1) to remove former paragraph (e), together with the duty that it imposed on the ALJ to re-contact the treating physician under certain circumstances. *Lowry v. Astrue*, 474 F. App'x 801, 805 n.2 (2d Cir. 2012) (citing How We Collect and Consider Evidence of Disability, 77 Fed. Reg. 10,651, 10,656 (Feb. 23, 2012) (to be codified at 20 C.F.R. § 416.912) (deleting former paragraph (e) and redesignating former paragraph (f) as paragraph (e)). The court applies the section in effect when the ALJ adjudicated plaintiff's claim. *Id.* The ALJ's decision in this case is dated November 9, 2015, thus, the new section applies.

The new section allows the ALJ to choose the appropriate method for resolving insufficiencies or inconsistencies and is designed to afford adjudicators "more flexibility." *Perrin v. Astrue*, No. 11-CV-5110, 2012 WL 4793543, at *3 n.3 (E.D.N.Y. Oct. 9, 2012) (citing How We Collect and Consider Evidence of Disability, *supra*). The ALJ must attempt to resolve the inconsistency or insufficiency by taking one or more of the following approaches:

> (1) recontacting the treating physician or other medical source, (2) requesting additional existing records, (3) asking the claimant to undergo a consultative examination, or (4) asking the claimant or others for further information.

*Id*. (citing 20 C.F.R. §§ 404.1520b(c)(1)-(4), 416.920b(c)(1)-(4)).

Despite the duty to develop the record, remand is not required where the record contains sufficient evidence from which the ALJ can assess the plaintiff's residual functional capacity. *Covey v. Colvin*, No. 13-CV-6602, 2015 WL 1541864, at *13 (W.D.N.Y. Apr. 6, 2015) (quoting *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33

(2d Cir. 2013)).

The court does note that on September 5, 2018, the Second Circuit remanded an action in which the ALJ failed to properly apply the "treating physician" rule because the ALJ did not give good reasons for failing to give the treating physician "controlling weight," because the ALJ failed to develop the record by recontacting the treating physician, and because on of the physicians who the ALJ relied upon, rendered an opinion after misreading another physician's report. *See Messina v. Comm'r*, No. 17-1598, ___ F. App'x ___, 2018 WL 4211602 (2d Cir. Sept. 5, 2018).

However, in *Smith v. Berryhill*, ___ F. App'x ___, 2018 WL 3202766, at *4 (2d Cir. June 29, 2018), the Second Circuit held that "the ALJ was not required to identify evidence explicitly rebutting the opinions of Smith's treating physicians before discounting or rejecting them." *Id.* (citing *Halloran*, 362 F.3d at 32).  In this case, the ALJ gave good reasons for giving "reduced weight" to some of Dr. Mitchell's findings. As stated above, Dr. Mitchell's contemporaneous treating notes, other than mentioning that plaintiff occasionally complained of back or other joint pain or weakness, never alluded to the functional restrictions that she stated in her RFC evaluation.  In fact, most of the plaintiff's musculoskeletal examinations resulting in normal findings. (T. 462-63, 471-72, 475-76, 480).  In addition, after an examination of the plaintiff, Dr. Lorensen found that plaintiff would not have gross limitations for sitting, standing, and walking. (T. 343).

Based on her findings, the ALJ was not required to recontact Dr. Mitchell to have her explain her physical RFC findings.  The ALJ was presented with conflicting

evidence, which she was entitled to weigh in order to properly determine plaintiff's RFC. *Smith v. Berryhill*, 2018 WL 3202766, at *4 (citations omitted). The ALJ took the entire record into account, both physical and mental limitations when determining plaintiff's RFC. Because the ALJ's RFC determination was supported by substantial evidence, the hypothetical question to the VE, tracking the RFC determination, was appropriate. Thus, the determination that plaintiff was not disabled is supported by substantial evidence.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the Commissioner's decision is **AFFIRMED**, and plaintiff's complaint is **DISMISSED**, and it is

**ORDERED**, that judgment be entered for the **DEFENDANT.**

Dated: September 11, 2018

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**